IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MICHELLE HUESTON GREEN,

     Plaintiff,

  vs.                                   1:21-cv-00087-LF-JMR

MERRICK B. GARLAND,[1]
Attorney General, U.S. Department of Justice,

     Defendant.

## **MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on defendant Merrick B. Garland's Motion for

Summary Judgment.  Doc. 62.  Plaintiff Michelle Hueston Green opposes the motion.  Doc. 73.

Having considered the parties' submissions and the relevant law, and for the following reasons, I

GRANT defendant's motion.

This case arises out of Ms. Hueston Green's employment with the Federal Bureau of

Investigation ("FBI"), and her ultimate termination.  She claims that former Assistant Special

Agent in Charge (ASAC) Robert White filed a complaint against her on the eve of his retirement

in retaliation for an Equal Employment Opportunity (EEO) complaint Ms. Hueston Green had

filed against him in May 2017.  After ASAC White submitted his complaint, the FBI

investigated her, suspended her without pay, and ultimately terminated her employment.

In his motion for summary judgment, defendant argues that he is entitled to summary

judgment because Ms. Hueston Green cannot establish a *prima facie* case of retaliation because

---

[1] Merrick B. Garland is automatically substituted for Jeffrey A. Rosen pursuant to FED. R. CIV. P.
25(d).

she cannot demonstrate a causal connection between her 2017 EEO complaint and her ultimate suspension and termination.[2]  *See* Doc. 62 at 2, 15–18.  Defendant also argues that the FBI articulated legitimate, non-retaliatory explanations for its decision to suspend and later terminate Ms. Hueston Green's employment, and that she has failed to demonstrate that these reasons are pretextual.  *Id.* at 2, 18–26.  Ms. Hueston Green argues in response that that there are material facts in dispute regarding the causation element as well as whether the FBI's reasons for terminating her are pretextual.  Doc. 73 at 18–24.  For the following reasons, I agree that defendant is entitled to summary judgment in his favor.

## I.  **Statement of Undisputed Facts**[3]

Plaintiff Michelle Hueston Green began working for the FBI on December 2, 1990. UMF 1; AMF 1.  She became a Supervisory Financial Operations Specialist in Albuquerque in October 2012.  UMF 2; AMF 1.  Ms. Hueston Green worked for the FBI for 29 years.  AMF 1.

ASAC White became Ms. Hueston Green's supervisor in December 2014.  UMF 3; AMF 2.  On May 3, 2017, Ms. Hueston Green filed an EEO complaint against ASAC White alleging

---

[2] The Court already has granted summary judgment in defendant's favor to the extent that Ms. Hueston Green's retaliation claim is based on ASAC White's misconduct complaint, the resulting investigation, and her suspension.  *See* Doc. 85.  The Court addresses her suspension in this motion as well, which, although unnecessary, provides additional reasons for entering summary judgment in defendant's favor on her retaliation claim to the extent it is based on her suspension.

[3] Ms. Hueston Green admits almost all defendant's Undisputed Material Facts (UMFs), but states there are Additional Material Facts (AMFs) that the Court also should consider.  Doc. 73 at 2–3. The Court thus recounts and relies on the UMFs and relevant AMFs about which there is no actual dispute.  Defendant's UMFs appear at pages 2 through 13 of his motion.  Doc. 62 at 2–13. Plaintiff's AMFs appear at pages 3 through 18 of her response.  Doc. 73 at 3–18.

For facts that the parties say they dispute or partially dispute, or which are not cited in the materials, the Court cites to the underlying exhibits and other materials in the record, as necessary.  *See* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

sexual and nonsexual harassment.  UMF 4.  This EEO complaint was resolved at mediation in July 2017.  UMF 5.  ASAC White knew about the complaint, participated in the mediation that settled it, and ultimately was required to make changes in his evaluation of Ms. Hueston Green.  AMF 22.  Terry Wade, the Special Agent in Charge (SAC) of the Albuquerque Field Office at the time, attended the mediation as Ms. Hueston Green's division head, Doc. 62-7 at 2,[4] and signed the settlement agreement on behalf of the FBI, Doc. 62-3 at 5; Doc. 72-13 at 2.  In the settlement agreement, the FBI "agree[d] there shall be no discrimination or retaliation of any kind against the Aggrieved [Ms. Hueston Green] as a result of filing this charge . . . ."  Doc. 62-3 at 5, ¶ 6; Doc. 73-13 at 2, ¶ 6.  The agreement also provided that "[i]f either party alleges a breach of the terms of this Settlement Agreement, the alleging party must notify the FBI's EEO Officer, in writing, of the alleged noncompliance within thirty (30) calendar days of when the party knew or should have known of the alleged breach."  Doc. 62-3 at 5, ¶ 7; Doc. 73-13 at 2, ¶ 7; AMF 25.

The FBI Inspection Division (INSD) is responsible for receiving complaints and conducting internal investigations regarding employee misconduct.  UMF 6.  After INSD determines a matter should be investigated and completes its investigation, the case is referred to the FBI Office of Professional Responsibility (OPR) for adjudication.  *Id.*  OPR is responsible for adjudicating misconduct investigations and imposing discipline on FBI employees who commit misconduct.  UMF 7.  OPR is not an investigative entity.  *Id.*  OPR does not participate in INSD's decisions to accept or investigate a case of alleged misconduct.  *Id.*  OPR reviews employee misconduct investigations conducted by INSD once INSD refers the matter to OPR.

---

[4] When citing to the exhibits, the Court cites to the CM/ECF document number and page number at the top of each page.

UMF 8.  OPR then adjudicates whether misconduct has occurred and, if so, what penalty should be applied.  *Id.*

On June 7, 2018, ASAC White sent an email to INSD concerning Ms. Hueston Green's conduct, alleging that Ms. Hueston Green had engaged in outside employment without authorization, and also that she had engaged in time and attendance fraud.  UMF 9; Doc. 62-6. Shortly thereafter, on June 30, 2018, ASAC White retired from the FBI.  UMF 10.  Also in June 2018, SAC Wade was named Assistant Director of INSD.  UMF 11.  Mr. Wade left the Albuquerque Field Office before ASAC White emailed INSD about Ms. Hueston Green in June 2018.[5]  *Id.*  Although Mr. Wade remembered Ms. Hueston Green's case being briefed while he was at INSD, Doc. 62-7 at 4, he did not have any involvement in the supervision and direction of INSD's investigation of Ms. Hueston Green, UMF 11.

In response to ASAC White's e-mail, INSD opened an investigation regarding Ms. Hueston Green on August 21, 2018.  UMF 12.  On August 27, 2018, James Langenberg, the new Albuquerque SAC,[6] notified Ms. Hueston Green of the INSD investigation, and Ms. Hueston Green signed the Notification Letter (hereafter "August Notification Letter").  *See id.*  The August Notification Letter informed Ms. Hueston Green that INSD had initiated an investigation concerning, among other things, allegations that she "ha[d] been conducting outside employment without prior authorization while on duty and using FBI property."  UMF 13.  SAC Langenberg instructed Ms. Hueston Green not to discuss the INSD investigation with other employees.

---

[5] Although Ms. Hueston Green states that Mr. Wade "signed off on the referral," Doc. 73 at 2–3, ¶ 2, she does not cite to any evidence to support this statement, *see id.*  Thus, this fact is undisputed.

[6] Defendant refers to Mr. Langenberg as both the SAC and the ASAC.  *Compare* UMF 12 *with* UMF 14.  The August Notification Letter indicates that Mr. Langenberg was the SAC, *see* Doc. 62-8; the Court therefore will refer to him as SAC Langenberg.

UMF 14.  The August Notification Letter also informed Ms. Hueston Green that she should not discuss the investigation with other employees.  *Id.*

On September 12, 2018, Supervisory Special Agent ("SSA") Sharon Gavin sent Ms. Hueston Green an e-mail informing her that her

> contact with other employees who could be witnesses to the investigation is troubling.  Please refrain from any further discussion of this matter with anyone . . . Your actions could be deemed to violate Offense Code 2.11, Obstruction of an Administrative Matter.

UMF 15.  Ms. Hueston Green responded to SSA Gavin the same day, stating that she would not discuss the INSD matter with anyone.  UMF 16.  A week later, on September 19, 2018, SSA Gavin sent another e-mail to Ms. Hueston Green, stating that it had been brought to her attention that Ms. Hueston Green had discussed the INSD investigation with other individuals.  UMF 17. SSA Gavin reiterated that Ms. Hueston Green needed to stop immediately.  *Id.*  Shortly thereafter, on September 23, 2018, INSD expanded its investigation of Ms. Hueston Green to include an additional allegation that she had had substantive discussions about the internal investigation with other employees after being instructed numerous times not to do so.  UMF 18.

During its investigation, INSD interviewed and obtained signed sworn statements ("SSSs") from numerous witnesses.  UMF 19; Doc. 62-5 at 5.  Ms. Hueston Green also was interviewed.  UMF 20.  Her interview took place on November 27, 2018, in Washington, D.C. *Id*.  Following her interview, Ms. Hueston Green reviewed a copy of her statement, initialed each page, and signed it.  *Id.*

On May 24, 2019, Jessica Loreto, the Unit Chief ("UC") of OPR's Adjudication Section and the proposing official for adverse actions, sent a letter to Ms. Hueston Green.  UMFs 21, 22. The letter informed Ms. Hueston Green that UC Loreto had completed her review of the administrative inquiry into the allegations of misconduct, and that UC Loreto was proposing that

Ms. Hueston Green's employment be terminated for the reasons set forth in the letter.  UMF 22.

The letter also informed Ms. Hueston Green that the Assistant Director of OPR would make the

final decision after considering Ms. Hueston Green's written or oral responses, if submitted.  *Id.*

In her letter, UC Loreto outlined the four misconduct allegations that she found were

supported by a preponderance of the evidence.  *See* Doc. 62-13 at 3.  She concluded that Ms.

Hueston Green had (1) engaged in unauthorized outside employment while on duty, (2) failed to

properly account for work and leave hours, (3) misused FBI property in furtherance of engaging

in outside employment, and (4) discussed her pending administrative inquiry with potential

witnesses.  *Id.*; UMFs 23, 29, 37, 43.

First, in finding that Ms. Hueston Green had engaged in unauthorized outside

employment while on duty, UC Loreto explained that FBI Offense Code 2.12 prohibited

employees from "[e]ngaging in any activity or conduct prohibited by the uniform Standards of

Conduct of Employees of the Executive Branch (5 C.F.R. Part 2635), the supplemental

regulations (5 C.F.R. Part 3801), or DOJ or FBI ethical polices," including unauthorized outside

employment.  UMF 24 (quoting Doc. 62-13 at 11).  UC Loreto further explained that the FBI's

Ethics and Integrity Program Manual ("FBI Ethics Manual") required employees who wanted to

engage in outside employment to submit an FD-331 for approval.  UMF 25.  The FBI Ethics

Manual defined outside employment as "any form of employment, business relationship or

activity, involving the provision of personal services whether or not for compensation, other than

in the discharge of duties."  *Id*.  UC Loreto noted that Ms. Hueston Green had applied for and

received approval for outside employment with three different businesses in 2011.  UMF 26.

However, by October 2012, all Ms. Hueston Green's pending outside employment requests and

approvals had expired.  *Id.*  UC Loreto concluded there was "no indication [Ms. Hueston Green]

ever submitted an FD-331 Request to Engage in Outside Employment in order to provide [her] personal tax preparation and submission services or bookkeeping for Business #1." UMF 27 (quoting Doc. 62-13 at 12). UC Loreto further concluded that Ms. Hueston Green's tax preparation and submission services required prior approval pursuant to the FBI Ethics Manual because Ms. Hueston Green "performed the tax services on an annual basis," therefore, "the activity is not outside the parameters of those which require prior approval." *Id.* UC Loreto further found that because Ms. Hueston Green had submitted several previous FFD-331 requests, was the subject of a prior administrative inquiry, had received a letter of censure, and she was "certainly on notice, if not uniquely familiar, with the outside employment policies." UMF 28 (quoting Doc. 62-13 at 12).

Second, in finding that Ms. Hueston Green had failed to properly account for work and leave hours, UC Loreto noted that FBI Offense Code 2.2 prohibited employees from "knowingly providing false or misleading information in a fiscal-related document; or signing or attesting to the truthfulness of the information provided in a fiscal-related document; or signing or attesting to the truthfulness of the information provided in a fiscal related document in reckless disregard of the accuracy or completeness of pertinent information contained therein." UMF 30 (quoting Doc. 62-13 at 12). "Time & Attendance (T&A) records" are documents of fiscal matters. *Id.* UC Loreto relied on the badge entry/exit systems records and Ms. Hueston Green's corresponding WebTA time and attendance records ("WebTA") from October 2015 through May 2018 to determine whether Ms. Hueston Green failed to account for her time and attendance. UMF 31. UC Loreto also relied on Ms. Hueston Green's statement in her SSS that her work schedule was 8:15 am to 5:00 pm. UMF 32. Ms. Hueston Green was not permitted to work remotely. UMF 33. Accordingly, Ms. Hueston Green's badge entry and exit records

"should reflect a complete workday as claimed in WebTA."  UMF 34 (quoting Doc. 62-13 at 6 n.4).  UC Loreto described the discrepancies she found between Ms. Hueston Green's badge entry/exit times and her WebTA records in detail in her letter.  UMF 35 (citing Doc. 62-13 at 6–7).  UC Loreto concluded that "[e]xamination of the records indicated [Ms. Hueston Green] had a pattern of certifying days in WebTA when entry/exit records indicated [she] was not at work that day, claiming eight-hour workdays but only working less than seven hours, and inaccurately documenting annual leave (AL) or sick leave (SL)."  UMF 36 (quoting Doc. 62-13 at 13).

Third, in finding that Ms. Hueston Green had misused FBI property in furtherance of engaging in outside employment, UC Loreto explained that pursuant to FBI Offense Code 3.6 "employees are prohibited from 'using a government computer for personal, unofficial, or unauthorized use.  This does not apply to *de minimis* use, where the cost to the government is negligible, as long as the use is not otherwise objectionable (e.g., pornography).' "  UMF 38 (quoting Doc. 62-13 at 13–14).  UC Loreto also explained that FBI Ethics Policy, Section 4.7.5 provided that " '[e]mployees may use Government property only for official business or as authorized by the Government.'  Although the FBI authorizes de minimis use of Bureau resources, 'FBI property . . . may not be used for . . . purposes that are prohibited or reflect adversely on the FBI.' "  UMF 39 (quoting Doc. 62-13 at 14).  UC Loreto relied on the admissions in Ms. Hueston Green's SSS that she brought documents pertaining to her tax preparation services to work and used FBI computers and printers to operate her outside employment activities in determining that Ms. Hueston Green had misused Bureau property.  UMF 40.  UC Loreto also relied on statements in the SSSs from Ms. Hueston Green's subordinates, Financial Operations Specialist ("FOS") #1 and #2, in determining that Ms. Hueston Green had misused FBI property.  UMF 41.  FOS #1 stated that Ms. Hueston Green had

" 'used the unclassified computer to access the state tax website.' " *Id*. (quoting Doc. 62-13 at 14).  FOS #2 stated she had observed Ms. Hueston Green " 'utilizing the office computer, printer and fax machine' in furtherance of the bookkeeping and tax services." *Id*.  UC Loreto concluded that because Ms. Hueston Green was "not permitted to engage in outside employment activities at all, [she was] not permitted to use Bureau resources in furtherance of those activities, no matter if the use was *de minimis*."  UMF 42 (quoting Doc. 62-13 at 14).  Therefore, Ms. Hueston Green's use of FBI computers and printers to perform her bookkeeping and tax services were unauthorized uses.  *Id.*

Fourth, in finding that Ms. Hueston Green had discussed her pending administrative inquiry with potential witnesses, UC Loreto explained that FBI Offense Code 2.11 prohibited employees from " '[t]aking any action to influence, intimidate, impede or otherwise interfere with an administrative matter.  Administrative matter includes but is not limited to, internal disciplinary investigations, OIG investigations, OPR adjudications, or EEO Matters.' "  UMF 44 (quoting Doc. 62-13 at 14).  In her analysis, UC Loreto relied on Ms. Hueston Green's August 30, 2018, instant message conversation with another FBI employee, SSA Gavin's communications to Ms. Hueston Green on September 12 and 19, 2018, and Ms. Hueston Green's September 12, 2018, instant message conversation with a yet another employee.  UMF 45.  UC Loreto also relied on statements in SSSs from four FBI employees with whom Ms. Hueston Green had discussed the pending administrative inquiry.  UMF 46.  For example, FOS #1 stated in her SSS that Ms. Hueston Green had asked her about whether she was keeping a log of her time, a question "directly related to the allegation" in the administrative inquiry that Ms. Hueston Green was not accurately reporting her time.  UMF 47 (quoting Doc. 62-13 at 15).  Ms. Hueston Green admitted in her SSS she openly made comments about how " 'sad that people had enough

time on their hands that they worried about what other people were doing.' " *Id*.  UC Loreto

found that these statements, said in the presence of FOS #1, could "be considered an attempt to

intimidate your subordinate about the subordinate's involvement in the inquiry or interfering in

the pending investigation."  UMF 51 (quoting Doc. 62-13 at 15).  UC Loreto also found that Ms.

Hueston Green's August 30, 2018, instant message conversation with FBI employee "SITS"

interfered with the pending administrative inquiry because Ms. Hueston Green was

> characterizing the administrative inquiry to SITS before investigators were able to
> speak with this potential witness.  She clearly was in agreement with you
> regarding ASAC [White] and you knew you were speaking with someone who
> would "do anything [she could] to help."

UMF 48 (quoting Doc. 62-13 at 15).  UC Loreto similarly concluded Ms. Hueston Green's

conversation with FBI employee "IOA" constituted "further discussion on the matter," and that

IOA "was in a position to 'vouch for [Ms. Hueston Green],' making her a potential witness."

UMF 49 (quoting Doc. 62-13 at 16).  UC Loreto also determined that Ms. Hueston Green's

discussions of the pending administrative inquiry with three FBI employees, "PS," "SA," and

"TM," were "at best, interfering with the pending matter and, at worst an attempt to influence

witnesses' statements."  UMF 50 (quoting Doc. 62-13 at 15).

UC Loreto was not involved in Ms. Hueston Green's 2017 EEO complaint against ASAC

White.  UMF 52.  She did not know the details of that complaint, and she did not consider Ms.

Hueston Green's EEO activity in weighing the documentation and evidence upon which the May

24, 2019, proposed dismissal letter was based.  UMF 53.  UC Loreto also did not consider Ms.

Hueston Green's EEO activity when she concluded that the allegations against Ms. Hueston

Green were substantiated or when she proposed that the FBI terminate her employment.  UMF

54.

On May 23, 2019, FBI Human Services Division Unit Chief Keri Vislocky sent Ms. Hueston Green a letter advising her that she was suspended indefinitely from duty and pay effective upon receipt of the letter.  UMF 55.  This action was "based upon the decision of Jessica A. Loreto" to "propose to dismiss you from" the FBI.  *Id.* (quoting Doc. 62-14 at 1).  On October 31, 2019, Ms. Hueston Green submitted a written response to UC Loreto's letter.  *See* UMF 56.

In evaluating this case, OPR Administrative Director ("AD") Stuart Platt considered INSD's report of its investigation of Ms. Hueston Green, UC Loreto's letter, all the SSSs in the INSD file, Ms. Hueston Green's October 31, 2019, written response and attachments, instant message conversations collected by INSD, Ms. Hueston Green's WebTA records, any field office facility entry records in the file, and the precedent reports for historical comparisons of prior disciplinary actions for the same type of offenses Ms. Hueston Green committed.  UMF 57.  After considering all the relevant facts, AD Platt drafted a twenty-page letter stating the reasons for his decision to dismiss Ms. Hueston Green from the FBI.  UMF 58.  The letter was sent to Ms. Hueston Green on November 7, 2019.  *Id.*  AD Platt relied on the same evidence considered by UC Loreto, and he too concluded that Ms. Hueston Green had engaged in unauthorized outside employment, had failed to accurately account for her work and leave hours, had misused FBI property, and had obstructed an administrative matter.  UMFs 59–62.  AD Platt agreed with UC Loreto's proposed penalty that Ms. Hueston Green be terminated from the FBI.  UMF 63.  He relied on the same reasoning for this penalty as articulated in UC Loreto's letter.  *Id.*

Like UC Loreto, AD Platt was not involved in Ms. Hueston Green's 2017 EEO complaint against ASAC White, and he did not have extensive knowledge of Ms. Hueston Green's EEO activity.  UMF 64.  AD Platt did not consider Ms. Hueston Green's 2017 EEO activity when

weighing the evidence supporting her proposed dismissal and when deciding to terminate her employment.  UMFs 65, 66.  Ms. Hueston Green was terminated from the FBI in November 2019.

## II.    The Complaint and Defendant's Motion

The single count in Ms. Hueston Green's complaint alleges a violation of Title VII of the Civil Rights Act of 1964 based on a hostile work environment and retaliation for protected EEO activity.  Doc. 1 at 11.  The Court dismissed Ms. Hueston Green's hostile work environment claim on March 31, 2022.  Doc. 20.  The Court also dismissed her retaliation claim to the extent it was based on ASAC White's misconduct complaint, the resulting investigation, and her suspension without pay.  Doc. 85.  Her retaliation claim remains to the extent that it is based on her termination.  *See id.*  In her complaint, Ms. Hueston Green alleges that the FBI retaliated against her after she complained about ASAC White and his treatment of her, and that her "complaints about ASAC White were a substantial factor in the decision to lodge a complaint and investigation against her."  Doc. 1 ¶¶ 86–87.  She also alleges that she was "wrongfully suspended and wrongfully terminated by Defendant on the basis of reprisal for prior protected equal employment opportunity activity under Title VII."  *Id.* ¶ 83.

In his motion, defendant argues that he is entitled to summary judgment because Ms. Hueston Green cannot establish a *prima facie* case of retaliation because she cannot demonstrate the required element of causation.  Doc. 62 at 1–2, 15–18.  He also argues that even if Ms. Hueston Green could establish a *prima facie* case of retaliation, the FBI has articulated legitimate, nonretaliatory reasons for its decision to suspend and terminate Ms. Hueston Green, and Ms. Hueston Green has failed to demonstrate that these reasons are pretextual.  *Id.* at 2, 18–27.  In response, Ms. Hueston Green argues that there are genuine issues of material fact

regarding the causal connection between her 2017 EEO complaint and her suspension and termination that prevents summary judgment. Doc. 73 at 18–21, 23–24. She also argues that there are genuine issues of material fact as to whether the reasons given for her suspension and termination are pretextual. *Id.* Because I agree that Ms. Hueston Green cannot establish a causal link between her 2017 EEO complaint and her 2019 suspension and termination, defendant is entitled to summary judgment in his favor. I also agree that the FBI articulated legitimate, nonretaliatory reasons for suspending and terminating Ms. Hueston Green, and she has failed to present any evidence that these reasons are pretextual. Defendant therefore is entitled to summary judgment on this basis as well.

## III.   Discussion

### A. Legal Standard for Summary Judgment

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if under the substantive law it could affect the outcome of a lawsuit, and an issue is "genuine" if a rational juror could find in favor of the nonmoving party on the evidence presented. *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant bears the initial burden of establishing that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "[T]he movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Kannady v.*

*City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).  If this burden is met, the non-movant must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial.  *Celotex*, 477 U.S. at 324.  The non-moving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment.  *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988).  Rather, the non-movant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (alteration in original) (internal quotation marks omitted).

At the summary judgment stage, the Court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  The Court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249. There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.*  Summary judgment may be granted where "the evidence is merely colorable, or is not significantly probative."  *Id.* at 249–50 (internal citations omitted).

### B.  Retaliation Claims Under Title VII

Title VII makes it unlawful for an employer to retaliate against an employee for opposing any practice that the statute makes unlawful, or for asserting a charge, testifying, assisting or participating in any way in a Title VII proceeding.  42 U.S.C. § 2000e-3(a).  "To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the

employment decision." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008).  This

burden may be satisfied in one of two ways.  Under the direct or "mixed motives" approach, a

plaintiff may offer direct evidence that retaliation played a "motivating part" in the adverse

employment decision.  *Id*. at 1225.  If the plaintiff can prove that retaliatory animus was a

motivating factor, the burden then shifts to the employer to demonstrate that it would have taken

the same action absent the retaliatory motive.  *Id*.

Alternatively, in the absence of direct evidence, a plaintiff may proceed under the

burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802–04 (1973).  Under this framework, Ms. Hueston Green first must establish a *prima facie*

case of retaliation by showing (1) "that she engaged in protected opposition to discrimination,"

(2) "that a reasonable employee would have found the challenged action materially adverse," and

(3) "that a causal connection exists between the protected activity and the materially adverse

action."  *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 803 (10th Cir. 2007).  To establish the requisite

causal connection between her protected conduct and her suspension and termination, Ms.

Hueston Green must show that a desire to retaliate against her for filing her 2017 EEO complaint

motivated the FBI to suspend and terminate her employment.  *See Wells v. Colo. Dep't of

Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003).

"Once the plaintiff successfully asserts a prima facie retaliation case, the burden shifts to

the defendant (i.e., employer) to come forward with a legitimate, non-retaliatory rationale for the

adverse employment action."  *Lounds v. Lincare, Inc*., 812 F.3d 1208, 1234 (10th Cir. 2015)

(internal quotation marks, ellipses, and citation omitted).  The burden is only the burden of

production, not persuasion.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142

(2000).  The defendant need only articulate facially non-retaliatory reasons for its actions; the

defendant need not litigate the merits of its reasoning, or even prove that the reasons given were bona fide.  *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir. 1992).

If the employer articulates legitimate, not-retaliatory reasons for the adverse action, the plaintiff must show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual or unworthy of belief.  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999).  As the Tenth Circuit has explained, "[p]retext can be inferred from evidence revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's explanation," or it can be shown "by providing direct evidence discrediting the proffered rationale, or by showing that the plaintiff was treated differently from others similarly situated."  *Lounds*, 812 F.3d at 1234 (internal quotation marks and citations omitted).

In this case, Ms. Hueston Green has not presented any direct evidence of retaliation but instead has elected to proceed under the *McDonnell Douglas* burden-shifting framework.  *See* Doc. 73 at 18–22 (Ms. Hueston Green's response applying the *McDonnell Douglas* burden-shifting framework).  Defendant argues that Ms. Hueston Green cannot establish a causal connection between her 2017 EEO complaint against ASAC White and the FBI's 2019 decision to suspend her and terminate her employment.  I agree.  But even assuming Ms. Hueston Green can establish a *prima facie* case of retaliation, she has not shown that that the FBI's proffered reasons for suspending her and terminating her employment are pretextual.

> 1.  *Ms. Hueston Green cannot establish a prima facie case of retaliation because she cannot establish a causal connection between her 2017 EEO complaint and the FBI's 2019 decision to suspend her and terminate her employment.*

One way that Ms. Hueston Green could establish a causal connection between her EEO activity and her suspension and termination is to show such close temporal proximity between the protected activity and the adverse retaliatory action that a factfinder could infer a retaliatory

motive.  *See Conner v. Schnuck Mkts, Inc.,* 121 F.3d 1390, 1395 (10th Cir. 1997).  If the temporal proximity is not close enough, the plaintiff must produce additional evidence to show retaliatory motive.  *Anderson*, 181 F.3d at 1179 ("unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation") (emphasis in original).  Temporal proximity is measured from the time that Ms. Hueston Green "engaged in protected opposition to discrimination" to when the FBI "took an adverse employment action against her."  *See Stover v. Martinez*, 382 F.3d 1064, 1071–73 (10th Cir. 2004) (analyzing whether each of employer's complained-of actions constituted an adverse employment action and determining length of time between protected activity and adverse employment action); *see also Meiners v. University of Kansas*, 359 F.3d 1222, 1231 (10th Cir. 2004) (discussing whether starting point should be date of protected activity or date employer learned of protected activity); *Nealis v. CoxCom, LLC*, 731 F. App'x 787, 790–91 (10th Cir. 2018) (rejecting argument that "temporal proximity can be measured from the time the employer takes an action that sets in motion the alleged retaliatory discharge").  A period of more than three months is insufficient to establish an inference of retaliatory motive.  *See Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013) (explaining that "if the adverse action occurs three months out and beyond from the protected activity, then the action's timing alone will not be sufficient to establish the causation element"); *see also Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1182 (10th Cir. 2006) (holding a period of nine months between the adverse action and protected activity was too temporally remote to support an inference of causation).

Here, the gap between Ms. Hueston Green's protected activity in 2017 and her suspension in May 2019 and termination in November 2019 is well over three months.

Therefore, temporal proximity alone does not support an inference of retaliation.  Although Ms. Hueston argues that ASAC White's heightened scrutiny of her and his gathering of evidence against her occurred immediately after she submitted her EEO complaint against him, and that this conduct constituted adverse employment actions, *see* Doc. 73 at 19–20, the Tenth Circuit case she relies on does not support her position.  In *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098 (10th Cir. 1998), the evidence at trial showed that within the two years after plaintiff submitted his written complaint of discrimination, he received twenty warning letters, two suspensions, and ultimately was terminated.  *Id.* at 1104.  The evidence also showed that the more warning letters an employee received, the more likely it was that that employee would be terminated, even if the warnings did not have an immediate effect on the employee's employment.  *Id.*  The Court therefore held that the warnings themselves could be considered adverse actions under the circumstances of that case.  *Id.*  In this case, there is no evidence that increased scrutiny or ASAC White's gathering of evidence before his retirement necessarily would lead to suspension or termination; indeed, Ms. Hueston Green was not even aware of these actions.

Ms. Hueston Green's argument with respect to causation focuses entirely on ASAC White and his purported desire to retaliate against her because she filed an EEO complaint against him.  *See* Doc. 73 at 18–21.  Ms. Hueston Green essentially argues that it was ASAC White's evidence and his misconduct complaint that started the investigation into her activities, and that because there is temporal proximity between his actions and her 2017 EEO complaint, she has established a *prima facie* case of retaliation.  *See id.*  ASAC White, however, was not involved in the FBI's decision to suspend or terminate Ms. Hueston Green.

Ms. Hueston Green essentially is relying on a "cat's-paw" theory of liability,[7] which allows a plaintiff to establish causation even without evidence that the "actual decisionmaker" possessed an unlawful motive.  *Thomas v. Berry Plastics Corp*., 803 F.3d 510, 514 (10th Cir. 2015).  An employer is liable for discrimination under this theory if a subordinate to the decisionmaker "performs an act motivated by [discriminatory] animus that is intended by the [subordinate] to cause an adverse employment action, and . . . that act is a proximate cause of the ultimate employment action."  *Staub v. Proctor*, 562 U.S. 411, 422 (2011) (describing the standard for the cat's-paw theory of liability in the context of the Uniformed Services Employment and Reemployment Rights Act).  Thus, to survive summary judgment when asserting a cat's-paw theory of liability, Ms. Hueston Green must show that there is a genuine issue of material fact that (1) ASAC White's filing of the misconduct complaint was motivated by discriminatory animus; (2) ASAC White intended the misconduct complaint to cause Ms. Hueston Green's suspension or termination, and (3) ASAC White's misconduct complaint proximately caused Ms. Hueston Green's suspension and termination.  *See Singh v. Cordle*, 936 F.3d 1022, 1038 (10th Cir. 2019).  Here, even assuming Ms. Hueston Green could satisfy the first two elements of the cat's paw theory, she cannot satisfy the last element.

The subordinate's discriminatory motive must be a "proximate cause" of the adverse decision.  *Staub*, 562 U.S. at 422; *Lobato v. New Mexico Environment Dept*., 733 F.3d 1283,

---

[7] An employer may be held liable under Title VII if the individual who decided to terminate the plaintiff's employment "merely acted as a rubber stamp, or the 'cat's paw,' for a subordinate employee's prejudice," even if the ultimate decisionmaker lacked discriminatory or retaliatory intent.  *See Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000).  The Tenth Circuit typically discusses the "cat's-paw" theory as relevant to whether the plaintiff can show that the employer's reasons for an adverse employment action are pretextual, but it also is relevant to whether Ms. Hueston Green has put forward sufficient evidence to prove the causation element of a *prima facie* case of retaliation.

1294–96 (10th Cir. 2013) (applying *Staub* proximate-cause standard to cat's-paw theory for Title VII claim).  If a final decisionmaker fires an employee based on "uncritical reliance" on facts provided by a biased subordinate, the subordinate's bias is the proximate cause of the employment action.  *Lobato*, 733 F.3d at 1294 (internal quotation marks and brackets omitted); *see Staub*, 562 U.S. at 421.  One way an employer can "break the causal chain" between the subordinate's biased motivation and conduct and the adverse employment action is for another person higher up in the decision-making process to independently investigate the grounds for dismissal.  *Thomas*, 803 F.3d at 516.  As the Supreme Court has explained, "if the employer's investigation results in an adverse action for reasons unrelated to the [biased] supervisor's original biased action, . . . then the employer will not be liable."  *Staub*, 562 U.S. at 421.

In this case, there is no evidence that the individuals who decided to suspend Ms. Hueston Green and terminate her employment in 2019—UC Loreto and AD Platt—were motivated by a desire to retaliate against her for her EEO activity in 2017.  Neither UC Loreto nor AD Platt were the subject of Ms. Hueston Green's 2017 EEO complaint, and neither were involved in the processing or resolution of that claim.  UMFs 52–54, 64–66.  While both generally were aware of Ms. Hueston Green's 2017 EEO activity, neither was aware of the details of that activity.  UMFs 52–53, 64.  No evidence indicates that UC Loreto or AD Platt had any motive to retaliate against Ms. Hueston Green for a 2017 EEO action in which they were wholly uninvolved.  *See* UMFs 52–53, 65–66; *see also Fulkerson v. Colvin*, No. 16-CV-889-BRB-KBM, 2018 WL 1726245, at *5 (D.N.M. Apr. 6, 2018) (holding that when decisionmaker was uninvolved in prior EEO activity, "mere knowledge of prior EEO activity is insufficient to show causation because it does not justify an inference of retaliatory motive"); *Meznick v. Gen.*

*Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991) ("[K]nowledge on an employer's part, without more, cannot itself be sufficient to take a retaliation case to the jury.")).

More importantly, once the FBI received ASAC White's misconduct complaint, the FBI independently investigated ASAC White's allegations.  In June 2018, ASAC White expressed concerns related to Ms. Hueston Green possibly engaging in "Time and Attendance Fraud," "engag[ing] in outside employment (probably without pay) without having secured authorization, and performing said outside employment while on duty in the confines of FBI space with FBI equipment and material."  Doc. 62-6 at 1.  In response, INSD conducted an extensive investigation that entailed interviewing and obtaining statements from numerous FBI employees, including Ms. Hueston Green, and reviewing hundreds of pages of documents regarding her time and attendance records, her badge entry/exit records, her approved and unapproved outside employment activities, and her electronic communications such as internal office instant messages/emails.  *See* UMFs 19, 26, 27, 28, 31, 40, 41, 45–50; Doc. 62-5 at 5.  After the investigation was concluded, INSD forwarded its file to OPR for adjudication.  *See* Doc. 62-13 at 2, ¶ 7.  UC Loreto was tasked with reviewing the INSD file and determining whether any action or penalty should be proposed.  UMF 21.  After carefully reviewing the record, she concluded that four allegations of Ms. Hueston Green's misconduct were substantiated.[8]  UMFs 23–51; Doc. 62-13 at 3.  For the reasons UC Loreto carefully explained in her letter, Doc. 62-13 at 3–21, UC Loreto proposed that Ms. Hueston Green be dismissed from the FBI, *see* UMFs 22–51.  Ms. Hueston Green was suspended without pay based upon UC Loreto's pending proposal to dismiss her.  UMF 55.

---

[8] UC Loreto found that the allegation that Ms. Hueston Green failed to train and provide resources to her direct report employees was not substantiated.  Doc. 62-13 at 3.

Ms. Hueston Green subsequently submitted her written response to UC Loreto's proposal.  UMF 56.  UC Loreto's proposal letter and the INSD file, along with Ms. Hueston Green's response, were submitted to AD Platt for his review.  UMF 57.  After completing his review, AD Platt agreed with UC Loreto that four allegations of misconduct were substantiated by the evidence and that Ms. Hueston Green's employment with the FBI should be terminated. UMF 58–63.  This independent review process, which included consideration of Ms. Hueston Green's position and counter evidence, broke any causal chain between ASAC White's purportedly retaliatory misconduct complaint and the FBI's decision to suspend Ms. Hueston Green and terminate her employment.  *See Thomas*, 803 F.3d at 517 (employer's independent termination review process broke the causal chain between supervisor's retaliatory animus and employee's termination).  As was true in *Thomas*, there is no evidence to suggest that the INSD's investigation or OPR's review was a sham, or that either INSD or OPR failed to adhere to FBI policies, or that either UC Loreto or AD Platt acted with animus.  *See id.*  Because Ms. Hueston Green has not produced any evidence that would support an inference that ASAC White's retaliatory animus was a but-for cause for her suspension and termination, she has not met her burden of establishing a *prima facie* case of retaliation.

> 2. *Even assuming Ms. Hueston Green can establish a prima facie case of retaliation, she cannot show that the FBI's proffered reasons for suspending her and terminating her employment were pretextual.*

The FBI's extensive explanation as to why it suspended and ultimately terminated Ms. Hueston Green's employment is facially non-discriminatory and discharges its burden under the *McDonnell-Douglas* burden-shifting framework.  *Brooks v. Barnhart*, 78 F. App'x 52, 55 (10th Cir. 2003) (defendant's burden under *McDonnell-Douglas* is light and is discharged by articulating a facially nondiscriminatory explanation for its actions).  Thus, Ms. Hueston Green now has the burden to establish pretext.  To do so, Ms. Hueston Green must show that the FBI's

proffered reasons for its action "were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Bekkem v. Wilkie*, 915 F.3d 1258, 1268 (10th Cir. 2019*)* (quoting *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006)). " 'Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.' " *Id.* (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

In attempting to meet her burden, Ms. Hueston Green first contends "there are a multitude of disputed facts as to the agency's justification for its action as meticulously detailed in the facts sections above." Doc. 73 at 21.  Ms. Hueston Green, however, does not point to any specific facts that show that the reasons given were unworthy of belief.  *See id.*  In general, her AMFs show that ASAC White did not treat her well, and that they did not have a good working relationship.  *See* AMFs 2–22.  Her AMFs also show that she believed that ASAC White filed the misconduct complaint against her in 2018 in retaliation for her EEO complaint against him in 2017.  *See* AMFs 23–32. Most of the rest of Ms. Hueston Green's AMFs relate to why Ms. Hueston Green believes that the FBI's decision to terminate her was unjust, the evidence that other employees also believed that ASAC White was vindictive, her explanations as to why she spoke to other employees about the investigation, and why she believed that the finding about her time and attendance fraud was incorrect.  *See* AMFs 33–71.  In analyzing pretext, however, the relevant inquiry is not whether UC Loreto's and AD Platt's proffered reasons for proposing Ms. Hueston Green's suspension and termination were wise, fair, or correct.  *Rivera v. City and County of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004).  Rather, the relevant inquiry is whether they honestly believed their reasons for suspending and terminating Ms. Hueston Green, and whether they acted in good faith based on those beliefs.  *Id.* at 925; *see also Piercy v.*

*Maketa*, 480 F.3d 1192, 1201 (10th Cir. 2007) (summary judgement granted where plaintiff offered no evidence that the decisionmakers who terminated her did not honestly believe their reasons for doing so); *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (the relevant "falsity" inquiry is whether the employer's stated reasons were held in good faith at the time of discharge).  Ms. Hueston Green presents no evidence that UC Loreto and AD Platt did not honestly believe the reasons they gave for suspending her and terminating her employment, or that they did not act in good faith.  Likewise, she has failed to present any evidence that the reasons given for her suspension and termination were pretextual.

In her response, Ms. Hueston Green focuses primarily on the allegation relating to her time and attendance fraud, stating that this was the "only terminable offense she was investigated for."  Doc. 73 at 22.  Although she does not cite to the record for this proposition, the Court presumes Ms. Hueston Green is relying on AD Platt's November 7, 2018, letter stating that he was dismissing her based on her false and misleading information relating to fiscal matters (based on her time and attendance fraud), and that he would have just suspended her for the other offenses.  *See* Doc. 62-10 at 16–18.  Citing only to her October 31, 2019, written response to the proposed termination, Doc. 73-10 (Exh. 10), she argues that there is conflicting evidence as to whether she actually failed to properly account for her time and attendance at work, and that some of the records that the investigators relied on were inaccurate, *see* Doc. 73 at 22.  But the fact that conflicting evidence exists about whether she properly accounted for her time is not the relevant inquiry; the relevant inquiry is whether UC Loreto and AD Platt suspended Ms. Hueston Green and terminated her employment to mask retaliatory motives.  *See Piercy*, 480 F.3d at 1201 ("conflicting evidence only affects summary judgment if it is relevant to the inquiry" and does not preclude summary judgment where no evidence suggested that plaintiff was dismissed "to

mask retaliatory motives").  Here, there simply is no evidence that suggests that UC Loreto and AD Platt did not honestly believe that Ms. Hueston Green engaged in misconduct and that she should be terminated for that misconduct.

Indeed, the evidence shows the opposite.  The evidence shows that first UC Loreto, then AD Platt, considered the entire investigative file, including Ms. Hueston Green's SSS, when deciding whether Ms. Hueston Green engaged in misconduct, and if so, what the penalty should be.  *See* Docs. 62-10, 62-13.  AD Platt also considered Ms. Hueston Green's written response to the proposed termination before he made his decision.  Doc. 62-10 at 1–10 (AD Platt's letter reviewing the evidence he considered).  With respect to the time and attendance allegations, both UC Loreto and AD Platt relied heavily on a comparison between Ms. Hueston Green's certifications in the WebTA program and her badge entry and exit records.  *See* Doc. 62-10 at 4–6; Doc. 62-13 at 5–7.  These records showed a discrepancy of 30.3 eight-hour workdays between October 2015 and May 2018 that Ms. Hueston Green was not present in the office but certified in WebTA that she worked.  *See* Doc. 62-10 at 5; Doc. 62-13 at 6.  During that same period, the records showed that she inaccurately documented approximately 68.3 hours of leave; in other words, she took approximately 68.3 more hours of leave than she claimed in WebTA.  *See* Doc. 62-10 at 5; Doc. 62-13 at 6–7.  Ms. Hueston Green contends that the records and logs that UC Loreto and AD Platt relied on were faulty, that ASAC White allowed her to "flex" her time, that her own accounting shows a discrepancy of only six days per year that were not properly accounted for, and that an employee with 29 years of service should not be terminated for conduct that she had not been written up for.  *See* Doc. 73 at 22; 73-10 at 5.  None of these contentions show that there is a genuine issue of material fact as to whether UC Loreto or AD Platt used the FBI's time and attendance records to mask a retaliatory motive to suspend Ms.

Hueston Green and terminate her employment.  Ms. Hueston Green has not met her burden of showing that the reasons given for her suspension and termination were pretextual.  Defendant is entitled to summary judgment in his favor.

**IV.**   **Conclusion**

For the foregoing reasons, the Court GRANTS defendant Merrick B. Garland's Motion for Summary Judgment (Doc. 62).  The Court enters judgment in defendant's favor.

Laura Fashing
United States Magistrate Judge
Presiding by Consent